**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PEDRO RODRIGUEZ, individually and on behalf of all others similarly situated,

    Plaintiff,

    v.

INTER-CON SECURITY SYSTEMS, INC,

    Defendant.

Civil Action No. 1:23-cv-8355

**CLASS AND COLLECTIVE ACTION COMPLAINT FOR DAMAGES, RESTITUTION AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMAND**

Plaintiff, Pedro Rodriguez, individually and on behalf of all others similarly situated, by their attorneys, The Law Office of Christopher Q. Davis, PLLC, allege, upon personal knowledge and upon information and belief as to other matters, as follows:

**NATURE OF ACTION**

1.    This is a collective and class action brought by Lead and Putative Class Representative Pedro Rodriguez (the "Representative Plaintiff" or "Lead Plaintiff") and all opt-in and/or putative plaintiffs (collectively, "Plaintiffs"), on their own behalf and on behalf of the FLSA collective and proposed Rule 23 class identified below.  Plaintiffs and the Putative Collective and Class Members were or are employed by Inter-Con Security Systems, Inc. ("Defendant" or "Inter-Con") as non-exempt hourly Airport Security Agents ("ASAs") and/or Lead Airport Security Agents ("LASAs") (together with ASAs, "Security Agents") at John F. Kennedy International Airport ("JFK").

2.    Defendant denied Plaintiffs and the Putative Collective and Class their "gap time" compensation and overtime compensation in violation of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201, *et seq.*, and New York Labor Law ("NYLL") § 650 *et seq*.

Defendant did this by, *inter alia*:

    i.    Requiring Security Agents to work "off-the-clock" following the completion of their scheduled hours; and

    ii.    Failing to provide Plaintiffs and the Putative Class with accurate wage statements in violation of New York Labor Law ("NYLL") §195(3).

3.    The Putative Collective and Class are similarly situated to the Named Plaintiff under Federal Rule of Civil Procedure ("FRCP") 23 and § 216(b) of the FLSA and have suffered the same violations pursuant to Defendant's common policies and practices.

4.    The Collective is made up of all persons who are or have been employed by Defendant as Security Agents at JFK at any time within the three years prior to this action's filing date through the date of the final disposition of this action (the "Collective Period") and who were subject to Defendant's unlawful policy of failing to pay overtime premiums for all hours worked over 40 in a given workweek, and/or failing to keep accurate records of hours Plaintiffs actually worked.

5.    The Class is made up of all persons who are or have been employed by Defendant as Security Agents at JFK within the period of six years prior to this action's filing date (the "Class Period") and who were subject to Defendant's unlawful policy and/or practice of failing to pay Plaintiffs' gap time compensation, and/or overtime premiums for all hours worked over 40 in a given workweek, failing to keep accurate records of hours Plaintiffs actually worked, and/or failing to provide Plaintiffs with accurate wage statements reflecting all hours, including overtime and gap time hours worked.

6.      Plaintiffs seek relief for the Collective under the FLSA and the Class pursuant to the applicable provisions of the NYLL, to remedy the Defendant's failure to pay all wages due, in addition to injunctive relief.

## PARTIES

7.      Individual and Representative Plaintiff Pedro Rodriguez is a former Security Agent, and presently and at all relevant times resides in Queens, New York.   He began providing security services at JFK through the Port Authority contracted service in March 2005, and worked at JFK dating back to 1995. Mr. Rodriguez worked as a Security Agent with multiple different security companies that contracted with PANYNJ to provide such services at JFK.

8.      In or around January 1, 2021, Inter-Con took over Allied Universal Security Services' ("Allied") contract with the PANYNJ.  Rodriguez continued to work at JFK as a Security Agent until the fall of 2023, at which time he was terminated.  At all relevant times, Plaintiff Rodriguez was an "employee" within the meaning of all relevant statutes.

9.      Defendant Inter-Con is California corporation with an east coast office in Jersey City, New Jersey.  Inter-Con's corporate headquarters is 210 S De Lacey Ave, Pasadena, CA 91105.

10.     At all relevant times herein, Inter-Con met the definition of an "employer" of Plaintiffs under all applicable statutes, including the FLSA and NYLL.

11.     The Defendant controlled the work performed by Plaintiffs by setting corporate standards, setting employee policies and procedures, and regulating employee behavior.

12.     At all relevant times,  Defendant has met the definition of Plaintiffs' "employer" under Section 3(d) of the FLSA, 29 U.S.C. § 203(d) and NYLL §190(3).

13.     Upon information and belief, Defendant maintains control, oversight, and direction over the operations and employment practices, including commonly managed human resources, benefits, and labor functions, for all Security Agents at JFK.

14.     At all times hereinafter mentioned, Defendant employed employees, including Plaintiffs, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials have moved in or produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

15.     Defendant's gross volume of business is not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

## JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.

17.     In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 207 *et seq*.

18.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

19.     Venue is proper in the United States District Court, Eastern District of New York pursuant to 28 U.S.C. § 1391, because the violations of law described in this Complaint occurred in this district.

20.     This Court has personal jurisdiction over Defendant because they routinely transact business in New York.

## WAGE AND HOUR COLLECTIVE
## AND CLASS ACTION FACTUAL ALLEGATIONS

21.     Defendant provides security services throughout the United States, including the New York metropolitan area.

22.     Since around January 2021, Defendant has provided security to facilities and property at JFK pursuant to a contract between and among Defendant and the PANYNJ.

23.     At all times relevant to this action, Defendant has directly employed approximately 200 Security Agents at JFK pursuant to their contract with the PANYNJ.

24.     Security Agents were scheduled for specific times to staff one of the many guard posts around JFK (i.e., their "Tour").

25.     There were three different Tours: A Tour, B Tour, and C Tour.

26.     Security Agents were assigned to stationary posts throughout the airport and tasked with various security responsibilities, such as checking airport and airline employee identification credentials, performing inspections on vehicles entering airport areas through secured gates, and guarding against trespassers.

27.     Lead Security Agents were generally assigned posts and/or tasks such as patrolling perimeter fences around airport runways and tarmacs and watching the monitors in JFK's remote camera control room.

28.     All Security Agents all begin their workday by reporting to a central location at JFK, Building 141, for "roll call."

29.     Roll call began thirty (30) minutes before a Security Agent was expected to be at their post.

30.     No more than seven (7) minutes prior to roll call, Security Agents were required to clock-in at one of three available tablets in the office within Building 141, and then were to report downstairs for roll call.

31.     If a Security Agent clocked in within 7 minutes before their start time Defendant rounded the Security Agents punch time to the half-hour of their scheduled start.

32.     Upon information and belief, Defendant did not similarly round back to the start time if a Security Agent clocked in within 7 minutes **_after_** their scheduled start time.

33.     In fact, it was very rare that Security Agents were late because they would get written up for being even just a minute late for roll call. As such, Security agents were almost always arriving more than 7 minutes in advance but being told to wait to clock in.

34.     As further detailed herein, Defendant did not have an FLSA compliant timekeeping system.

35.     Security Agents were all paid on an hourly basis.

36.     Each Tour was scheduled for 8.5 hours, with a 50-minute lunch break, of which 30 minutes was unpaid.

37.     As such, a paid shifts was supposed to consist of eight (8) hours of working time, and thirty (30) minutes of unpaid break time, totaling forty (40) hours of working time per week.

38.     The A Tour was scheduled for roll call from 11:30pm to 12am and post time from 12am to 8am; the B Tour was schedule for roll call from 7:30am to 8am and post time from 8am to 4pm; and the C Tour was scheduled for roll call from 3:30pm to 4pm and post time from 4pm to 12am.

39.    All Security Agents would clock-in electronically before the start of their shifts; however, Defendant's office staff regularly clocked out for Security Agents before they were finished working to avoid paying overtime premiums for post-shift time worked.

40.    Specifically, Security Agents were not permitted to clock out themselves at the actual time that they finished their workday; rather, an office staff member would clock out for any Security Agent that had not returned to Building 141 by the end of their scheduled shift.

41.    For example, if a shift ended at 4pm, and a Security Guard arrived back at Building 141 at 4:15pm because of being relieved from their post late, they were told by the office staff, "I got you don't worry about it," referring to punching out for the day.

42.    Security Agents were also not provided any means by which to record the hours that they were not relieved from duty during their meal or rest breaks.

43.    Pursuant to Plaintiffs' union contract, Security Agents were supposed to be allotted one fifty (50) minute lunch break per shift, of which 30 minutes was unpaid and 20 minutes was paid.

44.    Plaintiffs' meal breaks were at scheduled times; that is, an employee would have to take his/her break at specified times during his/her shift and needed relief to come before they could take a meal break.

45.    Defendant's work rules prohibited Security Agents from consuming food while on post assignments.

46.    An employee found consuming food at a post or inside a vehicle, for example, would be subject to disciplinary sanctions, and ultimately, termination.

47.    Security Agents, assigned to specific posts at JFK, would have to wait to take a meal break until a replacement showed up at their post to replace them.  The replacement would

be driven in a vehicle belonging to Defendant to the post in question, and the Security Agent leaving for his/her lunch break would then ride in the vehicle that had brought his/her replacement to a designated place for taking meals and/or a nearby place for grab-and-go food (i.e., 7-11).

48.     If a Security Agent's replacement appeared late to the post, the Security Agent's lunch break would not be extended on the back end – that is, the Security Agent was on-duty, at his/her post, during his/her allotted lunch break (of which 30 minutes was unpaid) and was nonetheless required to return to his/her post at the scheduled end time of the lunch break, despite not being relieved of their duties at the start of their lunch break.

49.     The time spent in the Defendant's vehicle traveling to and from a lunch area was compensable time because Plaintiffs were not fully relieved of their security related duties during such travel time.

50.     Any lunch travel time that exceeded 20 minutes meant that the Plaintiffs were not getting the benefit of a bona fide 30-minute lunch break.

51.     Upon information and belief, all Security Agents experienced the same travel time and late relief issues that resulted in unpaid overtime hours each week.

52.     When Security Agents worked more than forty hours in a scheduled week, they were entitled to one and one-half time their regular hourly rate of pay for that additional time, as overtime pay.

53.     Pursuant to Defendant's work rules, while driving or riding in a vehicle controlled by Defendant, all employees were "on duty."  Thus, they were required to be on the lookout for any security-related issues and if they observed a security-related incident occurring while riding in or driving the vehicle, employees were required to take any and all necessary action.

54.     In addition, drivers were subject to Defendant's rules regarding the operation of the vehicle.  If the employee driving the vehicle committed a traffic infraction and was ticketed by PANYNJ Police, or if the driver drove in a manner contrary to Defendant's rules regarding proper driving, that employee was subject to disciplinary action by Defendant, including termination.

55.     Further, if, while riding in a vehicle, an employee-passenger observed the vehicle's driver committing a traffic infraction or otherwise driving in a manner contrary to Defendants' rules regarding proper driving, the employee-passenger was duty-bound to report such infraction to a supervisors or management.  If the employee-passenger failed to report the driver's infraction, that employee was herself subject to disciplinary action, up to and including termination.

**All Security Agents Start Their Shifts with Roll Call Before Relieving the Prior Tour**

56.     Every Security Agent's shift began with roll call.

57.     Roll call included a daily briefing on information from Inter-Con or Port Authority necessary for the day's work, personal appearance and fitness for duty inspections and dispatching to assigned posts.

58.     Roll call typically took at least 15 minutes, but at times took 20 to 25 minutes, after which Security Agents left Building 141 to obtain their vehicle assignment and inspect the vehicle, which took another few minutes, and then drive out to their post assignments.

59.     To reach their assigned post locations, Plaintiffs were required to drive, or be a passenger in, official security vehicles owned and/or operated by Defendant.  The time Plaintiffs spent driving in such official security vehicles was ***always*** considered "on duty," even if their shifts had ended.

60.     The incoming shift would relieve the outgoing shift at each post.

61.     Several Security Agents would be assigned to a vehicle to drop off and pick up other Security Agents on their way out to their respective posts.

62.     This would greatly delay the relief process, and lateness was a frequent occurrence particularly at the remote posts and construction posts.

63.     In fact, at construction posts, the Security Agent assigned to that post for the day would need to call in for relief and was prohibited from locking up or leaving (even though they had a vehicle to do patrol that they could have driven back to Building 141) until a supervisor showed up.

64.     This often required waiting 10-15 minutes for someone to show up and then another 10-15 minutes to return to Building 141, resulting in regularly working post-shift time.

65.     In general, the entire process of conducting roll call, obtaining vehicle assignments, and relieving the prior shift took longer than the 30-minutes allotted and meant that Security Agents arrived at their assigned posts to relieve the prior Tour approximately 5 to 15 minutes late, depending on how remote their post assignment was.

**Defendant's Unlawful, "Off-The-Clock" Post-Shift Practices for Security Agents at JFK**

66.     Plaintiffs incorporate by reference all the factual allegations made in the preceding paragraphs.

67.     After clocking in, Security Agents participated in roll call, drove or rode to their posts in vehicles owned/and or operated by Defendant, and either spent their shifts in those vehicles riding around JFK and/or at a designated posting.

68.     The posts were located all around the JFK Airport grounds.

69.     Some posts were very close to Building 141, and as such were less likely to result in, albeit not immune to, late relief and late return to Building 141 to clock-out by the end of a shift.

70.     The Security Agents are required to swipe out at their post assignment, which would have an accurate record of their relief time but would not account for the time on-the-clock returning to Building 141 before officially clocking out and being "off duty."

71.     In general, Security Agents were not paid for the time spent waiting for late relief, and/or returning to Building 141 (referred to herein as "Transition Time") if it meant they clocked out after their shift ended.

72.     Security Agents reporting to their posts were typically arriving 5 to 15 minutes late because the time spent in roll call, obtaining a vehicle, and then driving to a post.

73.     This meant the Security Agents on the prior Tour were waiting to be relieved past their shift end time (which was the exact same time as the next Tour's post start time) by approximately 5 to 15 minutes.

74.     The Security Agents being relieved would still need to drive back to Building 141 in a company vehicle, which, depending on the post location, was between 5 to 15 minutes away.

75.     Transition Time forced ASAs to work off-the-clock after the end of their shifts between 10 to 20-plus minutes at least three times a week, resulting in approximately thirty (30) to sixty (60) minutes of unpaid post-shift overtime per week per Security Agent.

76.     Generally, the more remote the post assignment the more off-the-clock time a Security Agent incurred that day.

77.     For example, Papa, Juliet, Romeo, Air Tran, Construction, and Fence Line posts were all approximately a 15-minute drive from Building 141.

78.     Thus, if a Security Agent was assigned to Papa was relieved 15-minutes late and still had a 10 to 15-minute drive back to Building 141, this meant they were working off-the-clock 30 minutes after their shift ended because Defendant's office staff was clocking them out at the precise end of their shift, not when they actually arrived back at Building 141.

79.     Security Agents were required to return to Building 141 at the ends of their shifts, to return the equipment and/or vehicles they had been provided that day.

80.     While driving back to Building 141, often after their shifts had ended, Security Agents were "on duty."

81.     Security Agents were obligated to fulfill identical duties while traveling back to Building 141 as they were expected to while standing at their posts.

82.     By way of example, including late relief, Lead Plaintiff Rodriguez spent at least ten (10) and upwards of twenty (20) minutes traveling back to Building 141 to drop off vehicles each shift during the entirety of his employment with Defendant as a Security Agent, resulting in between thirty (30) minutes to sixty (60) minutes of unpaid overtime per week depending on where he was posted for the day.

83.     Upon information and belief, all Security Agents were subject to the same policies and practices that resulted in significant unpaid post-shift overtime for late shift relief and travel time.

84.     The SEIU would not file grievances on behalf of Security Agents who were forced to perform the "off the clock" work after their shift.

**Defendant Has Knowledge Of The Widespread "Off-The-Clock" Practices at JFK**

85.     Defendant's knowledge of the widespread "off-the-clock" practices at JFK was well known at all times relevant to this action.

86.     The prior security company that had the contract with JFK – Allied – was previously sued for these same unlawful off-the-clock practices.

87.     After Allied was sued they had implemented processes by which Security Agents would receive compensation for late relief, and/or put processes in place to limit the frequency of late relief and Transition Time that would result in overtime hours.

88.     After Defendant took over the security contract at JFK from Allied, the oversight over overtime hours incidental to Transition Time was abandoned.

89.     Defendant also has on-site Human Resources personnel at JFK who witnessed the off-the-clock work that was not compensated.

90.     In addition, the JFK operations were run by a Project Manager who was well-aware of the off-the-clock work.

91.     Plaintiffs repeatedly made both Human Resources personnel and the Project Manager aware of Defendant's "off the books" practices with respect to the end of shifts, both orally and in writing.  However, those complaints went unheeded.

92.     Plaintiffs regularly complete forms to reconcile their pay due to these unlawful practices and, nonetheless, the issues go unpaid and unresolved.

93.     The amount of overtime due to Plaintiffs can be verified by time records and other documents that were contemporaneously maintained by Defendant.

94.     Plaintiffs believe that the Defendant refused to pay them the overtime to which they are legally entitled because Defendant's contract with the PANYNJ does not provide for reimbursement of overtime by the PANYNJ to Defendant.

95.     Supervisors often received complaints directly from Security Agents but were not authorized to make any changes to a Security Agent's pay.

96.     By way of example, while Mr. Rodriguez was employed by Defendant as a Security Agent, he frequently complained about working unpaid overtime before and after his shift.

97.     Supervisors would say they would "look into it," or to complete a reconciliation form to get paid.

98.     However, Mr. Rodriguez was rarely paid for this off-the-clock pre- and post-shift time.

99.     Upon information and belief Supervisors were under direct orders by upper management not to compensate Security Agents for their off-the-clock work, even when they complained.

## FLSA COLLECTIVE ACTION ALLEGATIONS

100.     Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

101.     Defendant employed Plaintiffs during the Collective Period.

102.     Defendant classified Plaintiffs and Members of the Collective as nonexempt for the purposes of the FLSA, paying them an hourly wage rather than an annual salary.

103.     Upon information and belief, there are approximately 200 current and former employees who are similarly situated to the Lead Plaintiff and who were similarly denied overtime compensation.

104.     Lead Plaintiff Rodriguez represents other employees and is acting on behalf of Defendant's current and former employees' interests as well as his own interests in bringing this action.

105.    Defendant unlawfully required Lead Plaintiff Rodriguez and all individuals employed as Security Agents to work past the end of their shifts without compensation.

106.    At all times during the Collective Period, Defendant, as a matter of common policy and/or practice, has not paid Lead Plaintiff Rodriguez and all individuals employed as Security Agents lawful overtime premiums for all hours worked in excess of 40 hours in a work week.

107.    Plaintiffs seek to proceed as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and the following class of persons:

> **Proposed Collective:**    All individuals employed by Defendant as Security Agents at JFK and who, at any point during the Collective Period, earned but were not paid lawful FLSA overtime premiums for hours worked over 40 in a work week during the Collective Period based on the practices alleged herein.

108.    Specifically, Plaintiffs' Proposed Collective is further defined as involving claims for unpaid overtime premium compensation for Defendant's practice of forcing Plaintiffs to work "off-the-clock" before the beginning and after the end of their shifts, which they knowingly suffered and permitted, and/or commonly enforced FLSA recordkeeping practice violations which resulted in unpaid wages.

109.    As such, Lead Plaintiff Rodriguez and the Proposed Collective suffered damages for unpaid earned overtime wages under the FLSA in nearly all, if not all, the weeks they worked during the Collective Period.

110.    Defendant was aware, or should have been aware, that the law required them to pay all non-exempt employees, including Lead Plaintiff Rodriguez and the Proposed Collective, an overtime premium of 1 and ½ times their regular rate of pay for all work-hours Defendant suffered or permitted them to work in excess of forty (40) per workweek.

111.    Defendant's conduct, as set forth in this Complaint, was willful and in bad faith, and has caused significant damages to Lead Plaintiff Rodriguez and the Proposed Collective.

112.    Defendant is liable under the FLSA for failing to properly compensate Lead Plaintiff Rodriguez and the Proposed Collective, and as such, notice should be sent to the Proposed Collective.

113.    There are numerous similarly situated current and former employees of Defendant who were subject to the aforementioned policies in violation of the FLSA who would benefit from the issuance of a Court supervised notice of the present lawsuit and the opportunity to join in the present lawsuit.

114.    Those similarly situated employees are known to the Defendant and are readily identifiable through Defendant's records.

## FEDERAL RULE OF CIVIL PROCEDURE
## RULE 23 NEW YORK CLASS ALLEGATIONS

115.    Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

116.    Plaintiffs seek to proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following defined classes:

**Proposed Class:**    All individuals employed by Defendant as Security Agents who, at any point during the Class Period,  earned but were not paid lawful NYLL overtime premiums for hours worked over 40 in a work week, and/or gap-time wages during the Class Period based on the practices alleged herein.

117.    Specifically, Plaintiffs' Proposed Class is further defined as involving: (i) claims for unpaid overtime and minimum wage compensation for Defendant's  practice of forcing Plaintiffs to work "off-the-clock" and without overtime and/or "gap time" compensation both during unpaid meal breaks, before the beginning of their shift and/or after the end of shifts which

they knowingly suffered and permitted, and/or commonly enforced NYLL recordkeeping

practice violations which resulted in unpaid wages; and (ii) claims for wage statement violations

for Defendant's failure to provide Plaintiffs' with accurate wage statements on each payday that

include the information required by NYLL §195(3), including the correct  number of hours

worked during the pay period.

118.    Defendant has violated NYCRR 142-2.2 and NYLL §§ 191, 193 by failing to pay

Lead Plaintiff Rodriguez and the Proposed Class at least one and one-half times the New York

state minimum wage for all hours worked over 40 during the class period pursuant to the same

illegal practices and policies alleged above.

119.    Defendant also did not provide the Named Plaintiffs or putative class with

accurate wage statements contain an accurate a breakdown of the number of actual hours worked

within each pay period as required by the WTPA.

120.     Plaintiffs were denied accurate information in their pay statements about their

rates of pay and hours worked.

121.    By not providing this information in their pay statements Plaintiffs were

prevented from identifying and correcting the wage theft, in the form of unpaid overtime, which,

as set forth herein, actually occurred during their employment with Defendant.

122.    This wage theft was a concrete downstream consequence of Defendants' failure to

provide information required by the WTPA.

123.    Because of Defendant's failure to provide accurate wage statements, Plaintiffs

had no understanding of the overtime pay for hours worked over 40.

124.    Defendants' failure to provide the statutorily required information in the wage

statements left the Named Plaintiffs, and all other Security Agents, unable to determine whether

they were being properly paid their wages, and, as a consequence, the Named Plaintiffs and putative class were not paid all wages required by law.

125.    Numerosity:    The Proposed Class is so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that during the Class Period, Defendant employed about 200 people who satisfy the definition of the Proposed Class.

126.    Typicality:    Plaintiffs' claims are typical of those of the Proposed Class. Representative Plaintiff Rodriguez is informed and believes that, like other Security Agents, the Class Members were subjected to Defendant's policies, practices, programs, procedures, protocols and plans alleged herein concerning the failure to pay proper wages, failure to keep adequate records and failure to furnish accurate wage statements.

127.    Superiority:    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

128.    Adequacy:    Representative Plaintiff Rodriguez will fairly and adequately protect the interests of the Proposed Class and have retained counsel experienced in complex FLSA and NYLL class and collective action litigation.

129.    Lead Plaintiff Rodriguez's interests are co-extensive with those of the Proposed Class that he seeks to represent.  They are willing and able to fairly represent the Proposed Class and to vigorously pursue their similar individual claims in this action.

130.    Commonality:  Common questions of law and fact exist to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class, including but not limited to:

    a.    Whether Defendant unlawfully failed to pay lawful overtime premiums for all hours worked over forty (40) in a workweek for those violations stated above;

b.    Whether Defendant unlawfully failed to pay lawful "gap time" wages for all hours worked under forty (40) in a workweek for those violations stated above;

c.    Whether Defendant unlawfully failed to pay the state statutory minimum wage to members of the Proposed Class in violation of the NYLL;

d.    Whether those violations were pursuant to a common policy or practice applicable to all class members;

e.    Whether Defendant furnished class members with accurate wage statements on each payday containing the information required by NYLL § 195(3);

f.    Whether Defendant kept and maintained records with respect to each hour worked by Plaintiffs and the Proposed Class;

g.    Whether those violations were pursuant to a common policy or practice applicable to all class members;

h.    Whether Defendant employed Plaintiffs and the Proposed Class within the meaning of New York law;

i.    The proper measure of damages sustained by the Proposed Class; and

j.    Whether Defendant's actions were "willful."

131.    These common questions of law and fact arise from the same course of events, and each class member will make similar legal and factual arguments to prove liability.

132.    Further, adjudication of each individual member's claim as a separate action would be dispositive of the interest of other individuals not party to this action, impeding their ability to protect their interests.

133.    The case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecution of actions by or against individual members of the class would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendant.

134.    Further, adjudication of each individual member's claim as a separate action would be dispositive of the interest of other individuals not party to this action, impeding their ability to protect their interests.

135.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members of the Proposed Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendant's common and uniform policies and practices denied the Proposed Class the wages to which they are entitled.  The damages suffered by the individual Proposed Class members are small compared to the expense and burden of individual prosecution of this litigation.  In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's practices.

136.    Plaintiffs intend to send notice to all members of the Proposed Class to the extent required by Rule 23.  The names and addresses of the Proposed Class are available from Defendant.

137.    During the class period, and upon information and belief, Plaintiffs each worked more than 1 hour of gap time for which they were not paid the lawful straight time wage under either the NYLL and more than 1 hour of overtime-eligible work during the class and collective class periods for which they were not paid a lawful overtime premium of time and one half of their regular rate of pay.

## AS AND FOR A FIRST CAUSE OF ACTION
**(Failure to Pay Overtime Compensation in Violation of the FLSA)**

138.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

139.    Plaintiffs consent in writing to be a part of this action, pursuant to 20 U.S.C. § 216(b).  Plaintiffs' written consent forms are attached hereto.  Plaintiffs anticipate that as this case proceeds, other individuals will sign consent forms and join as plaintiffs.

140.    At all relevant times, Defendant has been an "employer" engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. § 203.  At all relevant times, Defendant has employed and/or continues to employ employees, including Plaintiffs, and members of the Collective.

141.    At all relevant times, upon information and belief, Defendant has gross operating revenues in excess of $500,000.00.

142.    The FLSA requires each covered employer to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours per work week.

143.    During their employment with Defendant, within the applicable statute of limitations, Plaintiffs and the other Collective members worked in excess of forty hours per workweek without lawful overtime compensation.

144.    Despite the hours worked by Plaintiffs and the Collective members, Defendant willfully, in bad faith, and in knowing violation of the FLSA, failed and refused to pay them overtime compensation.

145.    Plaintiffs were not paid FLSA mandated overtime premiums uniformly and based on the policies and practices articulated above.

146.     Also, by failing to accurately record, report, and/or preserve records of hours worked by Plaintiffs and the Collective, Defendant has failed to make, keep, and preserve records with respect to each of their employees sufficient to determine their wages, hours, and other conditions and practices of employment, in violation of the FLSA, 29 U.S.C. § 201, *et seq*.

147.     Plaintiffs and all similarly situated employees are victims of uniform and employer-based compensation policies.  Upon information and belief, these uniform policies, in violation of the FLSA, have been applied, and continue to be applied, to all Security Agents, employed by Defendant in JFK.

148.     Defendant has failed to make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiffs and the Collective.

149.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C §§ 216(b) and 255(a).

150.     Because Defendant's violations of the FLSA were willful, a 3-year statute of limitation applies, pursuant to 29 U.S.C. § 255.

151.     Due to Defendant's FLSA violations, Plaintiffs and the members of the Collective are entitled to recover from Defendant damages in the amount of their respective unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Failure to Pay Overtime Compensation in Violation of the NYLL)**

152.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

153.     At all relevant times, Plaintiffs were employees and the Defendant has been their employer within the meaning of the NYLL.

154.    The overtime wage provisions of NYLL Article 19 and its supporting regulations apply to Defendant.

155.    Defendant has failed to pay Plaintiffs and the Proposed Class the overtime wages to which they were entitled under the New York Labor Law.

156.    By Defendant's failure to pay Plaintiffs and the Proposed Class Members premium overtime wages for hours worked in excess of 40 hours per week, they have willfully violated NYLL Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

157.    Also, Defendant has violated NYCRR 142-2.2 and NYLL §§ 191 and 193 by failing to pay Plaintiffs and the Proposed Class at least one and one-half times the minimum wage for all hours worked over 40 in any workweek during the Class Period.

158.    Due to Defendant's violations of the NYLL, Plaintiffs and the Proposed Class are entitled to recover from Defendant all unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
**(Failure to Pay "Gap Time" Wages in Violation of NYLL)**

159.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

160.    At all relevant times, Plaintiffs were employees and the Defendant hasbeen their employer within the meaning of the NYLL.

161.    The provisions of NYLL Article 19 and its supporting regulations apply to Defendant, and protect Plaintiffs and the Class.

162.    Pursuant to the agreed-upon terms of their employment, Defendant was required to pay Plaintiffs and the Putative Wage Class a set hourly rate for all hours worked.

163.    Defendant failed to pay Plaintiffs and the Putative Wage Class Members their agreed-upon hourly wages (i.e. "gap time" or "straight time" wages") to which they were entitled under the NYLL and supporting New York State Department of Labor Regulations.

164.    NYLL § 663(1) states: "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled … he or she shall recover in a civil action the amount of any such underpayments…"

165.    Through their knowing or intentional failure to pay agreed-upon wages (i.e. "gap time" or "straight time" wages") to Plaintiffs and the Class, Defendant has willfully violated the NYLL, Article §§ 190 *et seq.*, and the supporting New York State Department of Labor Regulations.

166.    By Defendant's failure to pay Plaintiffs and the Class their gap time wages, Defendant  has willfully violated Article 19, §§ 663 *et seq.* of the NYLL and the supporting New York State Department of Labor Regulations.

167.    Due to Defendant's willful violations of the NYLL, Plaintiffs and the Proposed Class are entitled to recover from Defendant all unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

<u>**AS AND FOR A FOURTH CAUSE OF ACTION**</u>
**(Failure to Furnish Accurate Wage Statements in Violation of NYLL §195(3))**

168.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

169.    At all relevant times, Plaintiffs were employees and the Defendant has been their employer within the meaning of the NYLL.

170.    The recording keeping provisions of NYLL Article 19 and its supporting regulations apply to Defendant.

171.    Defendant did not provide Plaintiffs and members of the Rule 23 Class with a legally sufficient wage statement upon the payment of wages, as required by NYLL § 195(3).

172.    NYLL §195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria required under the NYLL.

173.    Due to Defendant's NYLL violations, Plaintiffs and Class members are entitled to statutory penalties each workweek that Defendant failed to provide them with accurate wage statements, up to a maximum of $5,000.00, plus reasonable attorneys' fees, costs, and injunctive and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on behalf of themselves and all members of the putative class and collective actions, prays for relief as follows:

A.    That the Court determine that this action may proceed as a class action under Rule 23(b)(1) and (3) of the Federal Rules of Civil Procedure;

B.    That Defendant is found to have violated the provisions of the New York Labor Law as to Plaintiffs and the Class;

C.    That Defendant is found to have violated the Fair Labor Standards Act as to Plaintiffs and the Collective;

D.    That Defendant's violations as described above are found to be willful;

E.    An award to Plaintiffs and the Collective of damages against Defendant and in favor of Plaintiffs and the Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

F.    An award to Plaintiffs and the Collective an additional equal amount as liquidated damages;

G.    An award to Plaintiffs and the Class of damages against Defendant and in favor of Plaintiffs and the Class, plus such pre-judgment and post-judgment interest as may be allowed by law;

H.    An award Plaintiffs and the Class an additional equal amount as liquidated damages;

I.    That Defendant further be enjoined to cease and desist from unlawful activities in violation of the FLSA and NYLL;

J.    That Plaintiffs' counsel and Plaintiff Pedro Rodriguez can adequately represent the interests of the class as class counsel and class representative, respectively.

K.    An award of reasonable attorneys' fees and costs pursuant to the FLSA, NYLL and/or other applicable law; and

L.    For such other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.

DATED:    November 9, 2023
          New York, New York

_____
Rachel M. Haskell, Esq.

The Law Office of Christopher Q. Davis
80 Broad Street, Suite 703
New York, New York 10004
646-430-7930 (main)
646-349-2504 (fax)
*Counsel for Plaintiffs and the Putative Collective and Putative Class*